DAVID J. COHEN, ESQ.
California Bar No. 145748
ALEXANDER P. GUILMARTIN, ESQ.
California Bar No. 306767
**BAY AREA CRIMINAL LAWYERS, PC**
300 Montgomery Street, Suite 660
San Francisco, CA 94104
Telephone: (415) 398-3900

Attorneys for Defendant **Emilio Lara**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR-15-00039-GEB |
| | ) | |
| Plaintiff, | ) | **MR. LARA'S TRIAL BRIEF** |
| | ) | |
| v. | ) | Date: March 20, 2018 |
| | ) | Time: 9:00 a.m. |
| EMILIO LARA, | ) | Court: Hon. Garland E. Burrell, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |

Mr. Lara submits the following trial brief to highlight for the District Court and the record the primary evidentiary disputes at issue pretrial. In response to the government's motions in limine, the Court issued a written ruling on these issues effectively acquiescing to all of the government's requests. Doc. no. 67. Mr. Lara had no opportunity to respond to the government's reply brief (*see* doc. no. 66), and the Court did not permit a hearing on the issues nor oral argument from the parties. Herein, Mr. Lara attempts to frame these disputes as clearly as possible, and urges the Court to reconsider its previous evidentiary rulings in light of his legal arguments, further factual developments, and the course of trial as it progresses.

1

**I.**

2

3

## THE COURT WAS WRONG TO EXCLUDE ACCURATE RETURNS THAT MR. LARA FILED ON BEHALF OF OTHER CUSTOMERS.

4

The government moved in limine to exclude "accurate returns" prepared by Mr. Lara for his

5

6

other customers. Doc. no. 58. The Court granted the government's motion without hearing from the

7

parties. Doc. no. 67.

8

**A.**   ***Sternstein*, and Not *Herzog*, Controls.**

9

Mr. Lara's defense theory is, and always has been, a simple one: he did not fabricate inflated

10

expenses or deductions on his clients' returns. Any evidence showing inaccurate numbers on returns

11

prepared by Mr. Lara can either be explained as an innocent mistake, an instance of the taxpayer

12

13

lying in order to protect themselves from the repercussions of their misrepresentations to their tax

14

preparer, or otherwise an error made by someone other than Mr. Lara. That defense is easily

15

bolstered by even the most cursory analysis of the factual circumstances in the case.

16

The government alleges that, over the course of four tax seasons between 2009 and 2012, Mr.

17

18

Lara selected 21 customers and 38 returns on which he would input exaggerated numbers for medical

19

expenses, unreimbursed employee expenses, and charitable contributions. This the government

20

claims he did despite having been in business for years beforehand, continuing to be in business for

21

years afterward, and the government having no evidence (and indeed never alleging) that he did so

22

for any other clients or any other returns (including his own).

23

24

The reality, however, is that Mr. Lara's business handled thousands of tax returns every year,

25

and that a database query conducted by the government for Mr. Lara's Practitioner TIN (PTIN) is

26

linked to 2,066 returns in 2009, 2,971 returns in 2010, 2,733 returns in 2011, and 2,106 returns for

27

2012. *See* Exhibit A. The 38 returns identified by the government as containing inaccurate expenses

28

amount to less than half of one percent of the returns Mr. Lara filed in the applicable years (approximately .38%). The reality is also that Mr. Lara received no commission or commensurate benefit for providing individual customers slightly higher refunds, as Mr. Lara charged a flat fee for federal income tax returns. Thus, the government's allegation is that Mr. Lara selected a minuscule and seemingly random percentage of his clients' returns and inputted exaggerated expenses on those returns, and that he did so without receiving any direct benefit.

There can be only one plausible (although still far-fetched) explanation for such conduct: Mr. Lara was engaged in a scheme to attract additional clients by providing higher refunds for a small portion of his customers in the hope that those dividends would result in positive buzz for his business and returning (or new) customers. That is precisely what the government was forced to allege in a Second Circuit case directly on point, *United States v. Sternstein*, 596 F.2d 528, 530 (2d Cir. 1979):

> In the instant case defense counsel argued that Sternstein had innocently entered the deductions in question based upon information supplied to him by the mistake or wrongful design of his taxpayer clients. In support of this contention counsel urged that Sternstein had no motive to prepare fraudulent returns since his fee was fixed and not contingent upon his client obtaining a refund. The Government replied in its summation that his motive was "to have satisfied customers, customers who come back to him year after year, because they got a refund." The issue of Sternstein's motivation and intent when he entered the deductions was thus placed squarely before the jury.

Notably, the *Sternstein* Court refused to defer to the "familiar proposition that 'evidence of noncriminal conduct to negate the inference of criminal conduct is Generally irrelevant.'" *Ibid*. (citing *Herzog v. United States*, 226 F.2d 561, 565 (9th Cir. 1955)). Instead, it determined that the defendant tax preparer was entitled to review and present materials, including IRS investigatory records, showing that he accurately prepared hundreds of other reports on a flat fee basis. *Id*. at 531. The Circuit's ruling was not limited to the defendant's entitlement to make his case to the jury, but

also extended to his entitlement to receive from the government the materials that *might* have shown the defendant accurately prepared returns for his other clients. *Ibid*.

The government here attempted to distinguish from *Sternstein* on three bases, all of which appear to have been accepted by this Court in its ruling: (1) there has been "no analysis showing mostly accurate returns" (doc. no. 66, 2:9-10); (2) "the government is not arguing that Lara had a scheme to attract clients by inflating deductions" (*Id.* at 2:19-20); and (3) "it would not be feasible to interview every one of Lara's customers in order to determine what proportion of returns was fraudulent" (doc. no. 59, 3:18-19). But there was "no analysis showing mostly accurate returns" in *Sternstein*, either. Instead, Sternstein merely made a claim that the requested materials would show accurate returns, and the Court addressed the government's refusal to turn over those materials to confirm or deny the defendant's claim. Mr. Lara has made the same claim here, and just as in *Sternstein*, the government has refused to turn over audit materials for uncharged returns (or any uncharged returns themselves) that would confirm or deny a defendant's claims. And although the government argues that it would be infeasible to interview every one of Mr. Lara's customers in order to determine the accuracy of each return he filed, the practical difficulties of the defense conducting an exhaustive investigation do not appear to be a reason to prohibit them from making any sort of attempt. In any event, the government *has* audited at least some number of Mr. Lara's uncharged returns, and it has explicitly refused to turn those materials over to the defense, just as it has refused to turn over the uncharged returns themselves, some number of which might reflect on their face whether any exaggerated expenses were claimed (as some number of those returns likely claimed no expenses at all).

The government most directly responds to *Sternstein*, however, by declaring its decision not to allege that Mr. Lara engaged in any scheme to attract clients. This, the government clearly does

in an attempt to ensure *Sternstein*'s inapplicability. Although it is entirely unclear that *Sternstein* is limited to the factual circumstances in which the government alleges a scheme to attract clients, even assuming that is the case, it is evident that if the government does not make such an allegation here, then it can offer no plausible explanation for Mr. Lara's purported conduct. Thus, in order to receive a favorable evidentiary ruling, the government has resorted to reducing its allegations to the level of absurdity, and to the extent that this Court has looked past that clear fallacy in order to deliver the results the government desired, it has done so in error.

For its part, the Court appeared to most directly rely on *Herzog v. United States*, 226 F.2d 561, 565 (9th Cir. 1955) for its order effectively excluding Mr. Lara's defense. *Herzog*, a 1955 case that the *Sternstein* Court directly addressed in its opinion, offers little more than the unextraordinary holding that evidence of a defendant not having "commit[ted] similar crimes on other occasions" does not establish innocence. *Ibid*. For that reason, the *Herzog* Court excluded evidence that, in contrast to the 18 instances of fraud established by the government, the defendant had refrained from committing 13 similar instance of fraud on other occasions. *Ibid*. This general principle does not extend as broadly as the government or this Court claims. Rather, multiple Circuits have recognized the wide latitude a defendant is afforded in introducing evidence showing a lack of criminal intent. *United States v. Brown*, 411 F.2d 1134, 1137 (10th Cir. 1969); accord, *Black v. United States*, 309 F.2d 331, 337 (8th Cir. 1962); *see Haigler v. United States*, 172 F.2d 986, 987 (10th Cir. 1949). Cf. *Bullard v. United States*, 395 F.2d 658, 660 (5th Cir. 1968); *Ehrlich v. United States*, 238 F.2d 481, 484 (5th Cir. 1956).

And indeed, there are two ways to think about the evidence Mr. Lara seeks to present to the jury, either of which is responsive to different factual circumstances. To the extent that uncharged returns show mistakes that Mr. Lara committed, as the government seems to believe they might,

those returns should be admitted to show that the conduct Mr. Lara is charged with was in fact the result of mere mistake or inadvertence, rather than criminal intent. But to the extent that uncharged returns show an absence of mistake on the part of Mr. Lara in thousands of other instances, as Mr. Lara alleges they will, those returns bolster the idea that the inflated expenses represented on a small percentage of Mr. Lara's clients' returns were likely the result of mistake or inadvertence, and not an intentional scheme on his part. Offered in this way, the introduction of these uncharged returns cannot possibly violate Rule 404(a), as they are expressly not being offered to show that Mr. Lara acted in conformity with his prior acts. Rather, those returns are offered to show that Mr. Lara did *not* act in conformity with his prior acts, and those prior acts thus cannot possibly have been offered for forbidden propensity purposes.

Mr. Lara has a constitutional right to present his defense, and that right is abridged by the Court's ruling that he is not permitted to present evidence entirely negating any plausible motive he might have had to conduct the alleged offenses. By restricting Mr. Lara's ability to admit uncharged tax returns (as Mr. Lara reads this Court's order to do), this Court prevents Mr. Lara not from admitting "other acts" evidence to show that he acted in propensity therewith on the dates charged in the indictment, but from admitting evidence that directly contradicts the government's entire theory of the case. This it does by allowing the government to pretend in its briefing that it will not present any theory at all. Undoubtedly, the trial will confirm that is not the government's intent, and this Court's ruling will tie behind Mr. Lara's back the very hands he needs to defend himself against the government's inevitable punches.

**B.**     **The Government Must Be Prohibited from Putting Forth Any Evidence of, or Arguing for, Mr. Lara's Motive, Including the Existence of Any Scheme on Mr. Lara's Part.**

Mr. Lara acknowledges that, over his objections, this Court may well choose to persist in its

holding that, because the government is not arguing that Mr. Lara engaged in a scheme to attract clients by inflating deductions, *Sternstein* is inapposite and any tax returns of Mr. Lara's other clients must be excluded at trial. If it does so, however, one consequence is abundantly clear: the government must be explicitly forbidden from presenting evidence of, or arguing at any point during trial regarding, Mr. Lara's motive and any scheme which he undertook. If the government chooses to proceed through trial without admission of the thousands of lawfully filed tax returns Mr. Lara prepared on behalf of his thousands of other customers, it must do so without reference to any scheme which might explain Mr. Lara's conduct in filing 38 false returns, whether in the government's opening, during its case in chief, on cross-examination, during closing arguments, or in rebuttal. That is, the government has expressly chosen to present its case without any means of explaining why Mr. Lara did what it accuses him of doing; it must be held to that representation. If the government, at any point during trial, makes any reference to Mr. Lara's motive or a scheme to attract clients by inflating deductions, Mr. Lara clearly must be permitted to present his defense in response, and all evidence of all returns he filed on behalf of his other customers immediately become relevant, probative evidence of (a lack of) intent.

## II.

## THE COURT WAS WRONG TO ADMIT EVIDENCE OF MR. LARA'S OTHER BAD ACTS.

The Court's March 9, 2018 order on the government's motions in limine also permitted the government to introduce evidence of Mr. Lara's other alleged wrongs, including additional inaccurate expenses on charged returns and his filing of an inaccurate return for an undercover agent. This should not have been permitted.

The alleged and uncharged conduct involving an undercover IRS agent has no relevance to

the conduct Mr. Lara is charged with committing. Importantly, this exchange took place on March 1, 2011, up to 25 months *after* 34 of the charges in the indictment occurred. Of the 38 counts with which Mr. Lara is currently charged,[1] only four occurred after the incident involving an undercover agent. The government's evidence, therefore, is not merely "other crime" evidence that must meet the requirements of Rule 404(b), but is "subsequent act" evidence that has historically been disfavored by federal courts. *See United States v. Boyd*, 595 F.2d 120, 126 (3d Cir. 1978) ["The logic of showing prior intent or knowledge by proof of subsequent activity escapes us."]; *United States v. Cowart*, 90 F.3d 154, 158 (6th Cir. 1996) ["rarely will an event that occurred subsequent to the charged crime be probative of motive, knowledge, or intent"]. After all, the government has no way of showing that Mr. Lara's intent on March 1, 2011 coincided with his intent in prior years, including all the way back to January 26, 2009.

The government's attempts to use this evidence against Mr. Lara to show identity or intent are particularly egregious in light of the fact that it has no evidence whatsoever of Mr. Lara's identity or intent on any of the charged occasions. Without its evidence of an uncharged instance of subsequent conduct, the government simply has no case. Mr. Lara's alleged interaction with an undercover agent is a flagrant instance of the "tail wagging the dog;" the entirety of the government's case proving its charges rests on an uncharged act that is the government's only evidence of critical elements of the crime. To use a different analogy, the government has put the cart before the horse, and without its horse, its cart is useless.

The evidence of Mr. Lara's interactions with an undercover agent must be excluded because their nonexistent probative value is substantially outweighed by their prejudicial effect, precisely the

---

[1] Today, the government indicated that it may seek to dismiss the majority of these counts, although Mr. Lara has not yet been informed which counts the government is unwilling or unable to proceed upon.

Mr. Lara's Trial Brief
*U.S. v. Lara*,
Case No. CR-15-00039-GEB                    8

type of impact Fed. R. Evid. 403 is designed to prevent. Undoubtedly, the government will rely on its audio and video recording of its undercover agent as a central component of its case in chief, as the remainder of the government's evidence can be generously described as speculation and conjecture. There is no chance that such vivid evidence presented over the course of a federal tax trial in which the government will otherwise rely on tax returns and its guesswork as to Mr. Lara's intent (and identity) will, at the conclusion of trial, appear "unimportant in relation to everything else the jury considered." *United States v. Gordon*, 987 F.2d 902, 909 (2d Cir. 1993). And no limiting instruction is likely to cure this prejudicial effect, given the brazen nature of the improper evidence. *See United States v. Jones*, 16 F.3d 487, 493 (2d Cir. 1994) ["To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities"]; *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002) [granting new trial despite limiting instructions].

But what is perhaps most discomforting about the government's attempts to rely on evidence of Mr. Lara's other acts to show his intent for the charged crimes is the fact that the government has fought so vigorously to ensure Mr. Lara is prohibited from offering evidence of other acts to show his *lack of intent* for the charged crimes. The Court's ruling on the government's motions in limine serves to allow the government to do what Mr. Lara may not: introduce other instances of similar conduct to show that the government's allegation that Mr. Lara willfully filed false tax returns is or is not plausible. The only difference between the government's offered evidence and Mr. Lara's? The government relies on uncharged conduct to raise the inference that Mr. Lara acted in accordance therewith during every one of his (prior) misdeeds, a goal that is expressly forbidden by Rule 404(a). Mr. Lara, by contrast, relies on uncharged conduct not to show propensity, but to show that the government's allegations of intentional tax fraud are directly contradicted by the defendant's overall

pattern of business dealings. By allowing the government to do what it should not be permitted, and by restricting Mr. Lara from introducing evidence that comprises the bulk of his defense, the Court has ensured a fair trial cannot take place.

**III.**

**PARTICULARLY IN LIGHT OF THE GOVERNMENT'S RECENT REPRESENTATIONS REGARDING MR. LARA'S PERSONAL INCOME TAX RETURNS, THE COURT WAS WRONG TO ADMIT EVIDENCE OF THESE RETURNS.**

After originally moving to admit Mr. Lara's personal tax returns into evidence (*see* doc. no. 60, 5:15-16 ["Those tax returns, *and* information about those returns maintained within records by the IRS, are admissible" (emphasis added)]; 5:20-21 ["Thus, Lara's own tax returns, even if not fraudulent, are admissible to show that he knew of the legal obligation to tell the truth on tax returns"], the government revised the confines of its request in its reply brief, clarifying that it now only "seeks to admit the existence of Mr. Lara's personal tax filings as a basis for anticipated witness testimony that filings require a jurat" (doc. no. 66, 5:22-23). The Court permitted the introduction of these records, subject to the limitation that the actual contents of the returns not be produced to the jury. Doc. no. 67.

But the government's shift in the actual materials it seeks to introduce at trial has directly affected the relevance of that which it wishes to put before the jury. As it explained in its reply:

> Because the jurats state different obligations for the taxpayer and the preparer, Lara's agreement to a jurat for his personal returns provides additional evidence of his knowledge of the legal obligation to tell the truth compared to the jurats on the returns that he prepared. As the taxpayer, Lara would have been legally required either to sign the jurat on a paper tax form or to sign the jurat on a Form 8879 authorizing a tax preparer to e-file on his behalf.

Doc. no. 66, 5:6-10. The government concedes that the jurats on his own personal tax returns "state different obligations" for him, as the taxpayer, than the jurats associated with Mr. Lara's work as a

tax preparer for his clients. Yet it is only the latter duty, Mr. Lara's duty as a tax preparer, that he is charged with having violated.

Thus, the government is now seeking to introduce circumstantial evidence (because they have recently confirmed that they do not have in their possession Mr. Lara's personal tax returns for the relevant years) that Mr. Lara was aware of a legal duty that is *not* the legal duty relevant to the charges. The government provides no explanation how its evidence of Mr. Lara's knowledge of a legal duty on his personal tax returns extends to what it describes as a "different" legal duty as a tax preparer, and the government offers no explanation for how circumstantial evidence of Mr. Lara's knowledge of a different jurat goes to show "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *See Cheek v. United States*, 498 U.S. 192, 201, 111 S. Ct. 604, 610 (1991).

It has become increasingly clear, which each subsequent filing and each factual representation it makes to the defense, that the government has no cogent theory by which it intends to offer evidence of Mr. Lara's personal tax filings. Limitation or no limitation, these records show no element of the offense, and have no probative value. They should be excluded accordingly.

**IV.**

**CONCLUSION**

The government presents the above evidentiary disputes to the Court for reconsideration in light of the information he presents, as well as that which will surface during trial. He respectfully requests this Court reconsider its earlier rulings on the government's motions in limine and, at a minimum, monitor the government's actions throughout trial to ensure it does not offer allegations of motive that it explicitly disclaimed in order to obtain a favorable evidentiary ruling.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**BAY AREA CRIMINAL LAWYERS, PC**

Dated: March 13, 2018                By: /s/ David J. Cohen
                                          DAVID J. COHEN, ESQ.

Attorneys for Defendant **Emilio Lara**